PWZ, INC.                                    *     IN THE
7100 Minstrel Way
Columbia, MD 21045                           *     CIRCUIT COURT

HANA CORP.                                   *     FOR BALTIMORE COUNTY
10193 Baltimore National Pike
Ellicott City, MD 21042                      *     Case No. _____

FENTON STREET SERVICE STATION, INC. *
8301 Fenton Street
Silver Spring, MD 20910                      *     **JURY TRIAL DEMAND**

REDLAND SERVICE STATION, INC.                *
17651 Redland Road
Derwood, MD 20855                            *

AMAFHH OASIS, INC.
7983 Muncaster Mill Road
Gaithersburg, MD 20877                       *

FUEL MANAGEMENT, INC.                        *
7311 Washington Boulevard
Elkridge, MD 21075                           *

ENERGY MANAGEMENT, INC.                      *
8850 Centre Park Drive
Columbia, MD 21045                           *

GTOWN, INC.                                  *
19815 Germantown Road
Germantown, MD 20874                         *

MILI ENTERPRISES, INC.                       *
161 Defense Highway
Annapolis, MD 21401                          *

BEST EFFORT FIRST TIME, LLC                  *
10611 Little Patuxent Parkway
Columbia, MD 21045                           *

EAST GUDE, INC.                              *
1215 East Gude Drive
Rockville, MD 20850                          *

HANOVER SERVICE INC.                         *
7898 Ridge Road

Hanover, MD 21076                            *

            Plaintiffs,                      *

    v.                                       *

EXXONMOBIL OIL CORPORATION                   *
3225 Gallows Road
Fairfax, VA 22037                            *

    SERVE ON: Resident Agent                 *
              CSC-Lawyers Incorporating
              Service Company               *
              7 St. Paul Street, Suite 1660
              Baltimore, MD 21202
                                             *

EXXONMOBIL CORPORATION                       *
f/k/a Exxon Corporation                      *
3225 Gallows Road
Fairfax, MD 22037                            *

    SERVE ON: Resident Agent                 *
              CSC-Lawyers Incorporating
              Service Company               *
              7 St. Paul Street, Suite 1660
              Baltimore, MD 21202
                                             *

SOUTHSIDE OIL, LLC
P. O. Box 6                                  *
267 Madison Street. Ext.
Boydton, VA 23917                            *

    SERVE ON: Resident Agent                 *
              CSC-Lawyers Incorporating
              Service Company               *
              7 St. Paul Street
              Suite 1660                      *
              Baltimore, MD 21202
                                             *

            Defendants.
                                             *

*         *         *         *         *         *         *

## VERIFIED COMPLAINT FOR ANTICIPATORY BREACH OF CONTRACT, TORTIOUS INTERFERENCE, DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, PWZ, Inc., Hana Corp., Fenton Street Service Station Inc., Redland Service Station, Inc., AMAFHH Oasis, Inc., Fuel Management, Inc., Energy Management, Inc., Gtown, Inc., Mili Enterprises, Inc., Best Effort First Time, LLC, East Gude, Inc., and Hanover Service, Inc. (hereinafter collectively referred to as "**Plaintiffs**"), through their undersigned attorneys, hereby file this Complaint against Defendants, ExxonMobil Corporation and ExxonMobil Oil Corporation (hereinafter collectively referred to as "**ExxonMobil**") and Southside Oil, LLC ("**Southside**") (hereinafter ExxonMobil and Southside are collectively referred to as "**Defendants**").

1.      Plaintiffs, who are ExxonMobil franchisees that are predominantly family-owned and operated local retail gasoline station businesses, bring this case to avoid substantial, imminent, and irreparable harm that they will suffer if ExxonMobil assigns its rights in its franchise agreements with Plaintiffs to Southside, a non-refiner distributor on or about June 15, 2010 (the "**Assignment**"). The franchise agreement vests nearly unfettered discretion and control over most aspects of Plaintiffs' businesses in ExxonMobil as franchisor, distributor, and landlord. If the Assignment occurs, Plaintiffs will involuntarily lose a refiner-franchisor that not only owns the Exxon trademark and has unparalleled financial resources and marketing experience, but also is prohibited from competing with Plaintiffs by virtue of Maryland's Divorcement Statute, Md. Code Ann., Bus. Reg. §10-311(a)(2) (the "**Divorcement Statute**"). In turn, Plaintiffs will be forced to do business with a distributor-franchisor, Southside, that owns no trademark, has no particular loyalty to the ExxonMobil brand or to Plaintiffs, has no proven franchise system, has substantial debt and limited financial resources, and most importantly, can and intends to compete with Plaintiffs because as a non-refiner Southside is not subject to the Divorcement Statute.

2.     Fearing that Southside will abandon vital aspects of the unique ExxonMobil franchise system including ExxonMobil's competitive pricing model and its reasonable fuel delivery and fuel payment requirements, Plaintiffs wanted to purchase their station premises and enter into a separate gasoline supply agreement with Southside. Southside negotiated with some Plaintiffs but ultimately refused to provide a reasonable offer. Plaintiffs' fears became a reality when in recent correspondence in May 2010, and at a meeting with all dealers on June 10, 2010, Southside presented the new procedures, requirements, and pricing model that Southside will implement immediately following the assignment at 12:01 a.m. on June 16, 2010.  The new procedures, requirements, and pricing policies substantially differ from ExxonMobil's system and not only eliminate substantial benefits but also will have a devastating effect on Plaintiffs' businesses. Southside indicated that it will not use ExxonMobil's pricing model, which sets the dealers' price to buy gasoline based on competition in the dealer's geographic area.  Instead, Southside intends to implement some unclear cost-based model that sets the dealers' price for gasoline based on Southside's cost and desired profit margins without regard to the dealers' ability to compete in their geographic areas.  Moreover, Southside will no longer honor the payment terms that have existed between Plaintiffs and ExxonMobil and, instead, is requiring the dealers to pay for gasoline from their own funds within one to two days after delivery.  Finally, Southside plans to implement a distorted version of ExxonMobil's current procedure for Plaintiffs' credit and debit card receivables on retail gas sales, which currently are directly deposited into ExxonMobil's bank, and then ExxonMobil deducts any of Plaintiffs' gas invoices from the funds before crediting Plaintiffs' bank accounts the next business day.  Southside intends to continue requiring Plaintiffs' credit and debit card receivables to go directly into ExxonMobil's bank, but ExxonMobil will deduct Southside's outstanding gas invoices from

Plaintiffs' credit and debit card funds before depositing the balance into Southside's bank account on the next business day.  Southside in turn will take an additional one to two days to get the funds to Plaintiffs depending on whether Plaintiffs choose to provide Southside with a fifty thousand dollar security deposit or a twenty-five thousand dollar security deposit.

3.     These and other policy changes along with Southside's stated plan to take over approximately one-third of the existing stations demonstrate that the assignment to Southside will materially change Plaintiffs' duties and increase their burdens and risks and, thus, is an invalid assignment under Maryland law and violates the franchise agreement.  Accordingly, Plaintiffs respectfully request that this Court avert the imminent destruction of their businesses and livelihood by enjoining the sale and wrongful assignment of franchisor rights to a competitor of Plaintiffs.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over Defendants pursuant to Md. Code Ann., Courts and Judicial Proceedings Article § 6-103(b)(1)(2) and (5) because ExxonMobil and Southside transact business, contract to supply goods, and/or have interests in, use, or possess real property in the State of Maryland.

5.     This Court is the appropriate venue for this dispute pursuant to Md. Code Ann., Courts and Judicial Proceedings Article §6-201(a) because ExxonMobil and Southside carry on a regular business in Baltimore County, Maryland.

## PARTIES

6.     Plaintiffs are all Exxon-branded retail dealers who lease their stations from ExxonMobil and operate retail service stations throughout Maryland.  The names and station addresses for each Plaintiff are as follows:

(a)     Plaintiff PWZ, Inc. is a Maryland corporation with its principal place of business in Howard County, Maryland.  Plaintiff operates a gasoline service station located at 7100 Minstrel Way, Columbia, Maryland 21045.

(b)     Plaintiff Hana Corp. is a Maryland corporation with its principal place of business in Howard County, Maryland.  Plaintiff operates a gasoline service station located at 10193 Baltimore National Pike, Ellicott City, Maryland 21042.

(c)     Plaintiff Fenton Street Service Station, Inc. is a Maryland corporation with its principal place of business in Montgomery County, Maryland.  Plaintiff operates a gasoline service station located at 8301 Fenton Street, Silver Spring, Maryland 20910.

(d)     Plaintiff Redland Service Station, Inc. is a Maryland corporation with its principal place of business in Montgomery County, Maryland. Plaintiff operates a gasoline service station located at 17651 Redland Road, Derwood, Maryland 20855.

(e)     Plaintiff Amafhh Oasis, Inc. is a Maryland corporation with its principal place of business in Montgomery County, Maryland. Plaintiff operates a gasoline service station located at 7983 Muncaster Mill Road, Gaithersburg,  Maryland 20877.

(f)     Plaintiff Fuel Management, Inc. is a Maryland corporation with its principal place of business in Howard County, Maryland.  Plaintiff operates a gasoline service station located at 7311 Washington Boulevard, Elkridge, Maryland 21075.

(g)     Plaintiff Energy Management, Inc. is a Maryland corporation with its

principal place of business in Howard County, Maryland. Plaintiff

operates a gasoline service station located at 8850 Centre Park Drive,

Columbia, Maryland 21045.

(h)     Plaintiff Gtown, Inc. is a Maryland corporation with its principal place of

business in Montgomery County, Maryland.  Plaintiff operates a gasoline

service station at 19815 Germantown Road, Germantown, Maryland

20874.

(i)     Plaintiff Mili Enterprises, Inc. is a Maryland corporation with its principal

place of business in Anne Arundel County, Maryland.  Plaintiff operates a

gasoline service station at 161 Defense Highway, Annapolis, Maryland

21401.

(j)     Plaintiff Best Effort First Time, LLC is a Maryland limited liability

corporation with its principal place of business in Howard County,

Maryland.  Plaintiff operates a gasoline service station at 10611 Little

Patuxent  Parkway, Columbia, Maryland 21045.

(k)     Plaintiff East Gude, Inc. is a Maryland corporation with its principal place

of business in Montgomery County, Maryland.  Plaintiff operates a

gasoline service station at 1215 East Gude Drive, Rockville, Maryland

20850.

(l)     Plaintiff Hanover Service, Inc. is a Maryland corporation with its principal

place of business in Anne Arundel County, Maryland.  Plaintiff operates a

gasoline service station at 7898 Ridge Road, Hanover, Maryland 21076.

7.     Upon information and belief, Defendant ExxonMobil Corporation, a New Jersey corporation with its principal place of business in Texas, is the world's largest integrated oil and gas company and regularly conducts business in Maryland.   It owns and controls the real property and fixtures on which Plaintiffs' gasoline service stations are located (hereinafter collectively the real property on which the service stations identified above are locate upon are referred to as the **"Premises"**).

8.     Defendant ExxonMobil Oil Corporation is a New York corporation with principal places of business in Texas and Virginia and it regularly does business in Maryland.   Upon information and belief, it is an affiliate and wholly owned subsidiary of ExxonMobil Corporation and is the franchisor in the franchise agreements with Plaintiffs.

9.     Defendant Southside is a Virginia limited liability company with its principal place of business in Virginia.   On February 18, 2010, Southside registered as a non-Maryland limited liability company with the State Department of Assessment and Taxation and in that registration indicated that it had done business in Maryland prior to the registration.

## STATEMENT OF FACTS

10.     At all times relevant to this action, each Plaintiff and ExxonMobil are parties to one or more franchise agreements (the **"Franchise Agreement"** or **"Franchise Agreements"**) and enjoy a franchise relationship pursuant to which ExxonMobil granted each Plaintiff a franchise under the Petroleum Marketing Practices Act[1] (**"PMPA"**) to lease the Premises for the operation of a gasoline service station, to purchase gasoline directly from ExxonMobil, and to sell gasoline products under ExxonMobil's trademark to the Maryland retail market.   A true and correct copy of the form PMPA Franchise Agreement and the Company Owned Dealer Operated

---

[1] The PMPA, 15 U.S.C. §§ 2801-2806, defines and establishes the parameters, including the grounds, required notice, and procedures, for termination or nonrenewal of a petroleum marketing franchise.

Lease Provisions to PMPA Franchise Agreement (the "**Lease**") are attached hereto as Exhibit 1 and incorporated herein by reference.

**The Unique System Developed and Owned by ExxonMobil for the Sale of Gasoline at Retail Service Stations Is A Material Aspect of the Franchise Agreement.**

11.     As set forth in the Franchise Agreement, through substantial time, skill, effort and money, ExxonMobil developed and owns a unique and distinctive system for the sale of Exxon-branded gasoline at retail service stations (the "**System**"). *See* Exhibit 1, ¶ A.

12.     The marketing strategies in ExxonMobil's unique System are based on extensive consumer research and analysis of customer-service and franchise retail and operating practices. *Id.* at ¶ B.

13.     In the Franchise Agreement, ExxonMobil identifies the characteristics of its System to include the following:

> (1) supply of Exxon-branded products; (2) certain procedures and methods of Exxon-branded product sales; (3) distinctive appearance, décor, design and trademark, and uniform standards; (4) unique and specialized training, management, marketing techniques and materials and socially responsible programs; and (5) advertising and promotional programs—all of which are integral and important to Franchise Dealer, ExxonMobil and other Exxon Outlets.

Exhibit 1, ¶ C.

14.     The Franchise Agreement expressly provides that the unique System created and owned by ExxonMobil was the basis for ExxonMobil and the dealers, including Plaintiffs, decision to enter into the Franchise Agreements. *Id.* at ¶ F.

**ExxonMobil's Status as a Refiner Provides an Additional Unique Benefit As a Result of Maryland's Divorcement Statute.**

15.     In addition to ExxonMobil's unique System, ExxonMobil's status as a refiner was another important factor to Plaintiffs when entering into the Franchise Agreements because they

knew that as a result of Maryland's Divorcement Statute, Md. Code Ann., Bus. Reg. §10-311(a)(2), ExxonMobil could never directly compete with them.

16.     Under the Divorcement Statute, producers of motor fuel and refiners, such as ExxonMobil, are prohibited from directly or indirectly operating retail outlets. *Id.*

17.     There is no such provision for distributors of motor fuel such as Southside.

**The Franchise Agreements**.

18.     The Franchise Agreement is a form PMPA Franchise Agreement drafted by ExxonMobil and presented to Plaintiffs as a non-negotiable take-it-or-leave-it form agreement that governs all aspects of their business including gasoline supply and trademark rights and incorporates a lease of the Premises.

19.     Plaintiffs were not able to negotiate the terms and the disparity of bargaining power between Plaintiffs and ExxonMobil would, in any event, make any such "negotiation" illusory.

20.     In drafting the Franchise Agreement, ExxonMobil gave itself substantial discretion and control over nearly every aspect of Plaintiffs' businesses limited only to the extent required by federal and state law and in some provisions even those limits were exceeded.  To name a few, ExxonMobil has complete discretion to set, change or eliminate the following: the price to be paid for gasoline products and the terms of payment; the pricing model to be used by ExxonMobil in determining the price it charges Plaintiffs for gasoline; the amount of gasoline security deposit, if any, required of Plaintiffs; the timing of delivery of gasoline to Plaintiffs; and the quantity Plaintiffs are required to purchase.  In addition, ExxonMobil required that it have inordinate access to, and control over, various financial aspects of Plaintiffs' businesses including the right to access Plaintiffs' bank accounts and to withdraw funds; the right to directly

receive Plaintiffs' debit and credit card receivables; and the right to deduct outstanding gasoline invoices from Plaintiffs' debit and credit card funds before depositing those funds into Plaintiffs' bank accounts.

21.     Under the Franchise Agreements, Plaintiffs are also required to purchase gasoline exclusively from ExxonMobil, and thus, are precluded from purchasing gasoline on the open market.

22.     Plaintiffs entered into such a one-sided, non-negotiable Franchise Agreement not only because of ExxonMobil's unique System and its benefits but also, and most importantly, because they knew that as a refiner, ExxonMobil could not compete with them because of the Divorcement Statute's prohibition on a refiner directly or indirectly operating a retail service station.  Consequently, Plaintiffs knew that ExxonMobil would exercise its discretion in good faith to facilitate Plaintiffs' success and ability to remain competitive.

23.     The importance of the Divorcement Statute was particularly important with respect to ExxonMobil's exercise of discretion in setting the price Plaintiffs pay for gasoline and the terms of such payment.

**Pricing for ExxonMobil Gasoline.**

24.     Upon information and belief, ExxonMobil sells its Exxon-Mobil branded gasoline at the ExxonMobil terminal located in Baltimore to distributors to be sold by independent gasoline service station dealers (such as Costco, Sam's Club, and Freestate) at wholesale prices established solely by ExxonMobil based on its own confidential formula.   ExxonMobil's wholesale price is known as the "Rack Price," and it is published by Oil Pricing Information Service ("**OPIS**").

25.     The price that Plaintiffs pay ExxonMobil is governed by Section 2.2 of the Franchise Agreement:

> For all Products purchased under this Agreement, Franchise Dealer shall pay ExxonMobil that price that is in effect at the time of loading of the delivery vehicle. Unless otherwise specified by ExxonMobil in writing, prices are prior to taxes and are subject to change by ExxonMobil at any time and without notice.

26.     This pricing provision is considered an open price term under the Uniform Commercial Code and therefore, although ExxonMobil has substantial discretion in setting the price, it must do so fairly and in good faith

27.     Currently, ExxonMobil delivers gasoline directly to each of Plaintiffs' stations, and the price that Plaintiffs pay ExxonMobil for the gasoline is referred to as the **"dealer tank wagon"** price or the **"DTW"** price.

28.     Plaintiffs' DTW price is established solely by ExxonMobil based on a pricing model known in the industry as "zone pricing." Upon information and belief, zone pricing is the practice of dividing stations into zones and then setting the price charged to dealers for gasoline, the DTW prices, based on the average posted prices of gasoline of all stations (including all other major brands in the area) in a zone less a margin in order to keep those stations competitive and profitable.

29.     Upon information and belief, ExxonMobil set Plaintiffs' DTW price, *i.e.* the price ExxonMobil charges them and all other ExxonMobil dealers in the same zone, by calculating the average retail price of all posted gasoline stations in the zone less a margin of approximately eight to ten cents per gallon.

30.     Thus, the course of dealing between ExxonMobil and Plaintiffs is for ExxonMobil to set the DTW price utilizing the zone pricing model, which ensures that Plaintiffs pay

ExxonMobil a lower price for gasoline than the average posted price in their zone and, thus, are able to be competitive in their local market.

31.    ExxonMobil trained Plaintiffs in this competitive pricing method, and Plaintiffs have structured their businesses accordingly, and depending on their zone, have focused their business strategies on a higher volume strategy to encourage not only higher gasoline sales but to increase sales in the convenience store and other retail areas.

**ExxonMobil's Payment Procedures for Gasoline Delivered to All Dealers.**

32.    ExxonMobil's payment procedures in Section 2.3 of the Franchise Agreement gives ExxonMobil complete discretion in setting the payment terms for gasoline deliveries.

33.    The course of dealing between ExxonMobil and Plaintiffs has always been that ExxonMobil delivers gasoline on day one, Plaintiffs receive an invoice on day two, and payment is due on day four.

34.    ExxonMobil's payment procedures also include requirements regarding the processing of Plaintiffs' debit and credit card receivables, which are retail sales of gasoline paid for by the consumer with either a debit card or credit card.  Plaintiffs' debit and credit card receivables are deposited directly into ExxonMobil's bank account.  ExxonMobil then deducts any invoices for gasoline delivered by ExxonMobil to Plaintiffs that are currently due and deposits the balance of the credit and debit card funds into Plaintiffs' bank accounts.  This process normally is completed in only one business day.

35.    The "Credit/Security" provision in Section 2.4 provides that "ExxonMobil in its sole discretion may extend credit to Franchise Dealers on terms and conditions as specified by ExxonMobil . . . If requested by ExxonMobil, Franchise Dealer shall provide to ExxonMobil and maintain security sufficient to secure payment for one or more loads of Product in such amounts

and forms as ExxonMobil may specify in its sole discretion . . . including a letter of credit or cash deposit."

36.     To the extent ExxonMobil requires any security deposit from Plaintiffs, it is between $0 and $25,000 and is held in a separate, secure account collecting interest for Plaintiffs' benefit.

**The Proposed Assignment to Southside Would Convert Plaintiffs from Profitable Direct-Served Dealers to Doomed Distributor-Served Dealers.**

37.     In September 2009, Plaintiffs learned that ExxonMobil intended to sell their current direct-served retail stations—meaning the Premises were owned by ExxonMobil, the fuel was distributed directly by ExxonMobil and the Franchise Agreement was with ExxonMobil— and convert them to distributer-served retail stations, meaning ExxonMobil intended to assign its distribution rights, its right to use the Exxon brand/trademark and all other rights under the Franchise Agreements and sell the Premises to a distributor or a "jobber" as they are known in the industry.

38.     Jobbers commonly purchase and resell multiple brands of gasoline and compete directly with independent dealers through stations that the distributors own and operate through employees or through commission agents.

39.     On or about November 16, 2009, Plaintiffs learned for the first time that ExxonMobil had entered into a contract with Southside, a distributor/jobber, to sell the Premises and to assign the Franchise Agreements for all the remaining ExxonMobil direct-served stations in Maryland, including Plaintiffs.

40.     Southside is a distributor based in Virginia that currently markets and distributes for ExxonMobil and BP in Virginia.  Upon information and belief, Southside owns and operates,

directly or through commission agents, retail service stations that compete directly with the dealers to whom it distributes gasoline.

41.     By assigning the Franchise Agreements to a distributor, ExxonMobil is assigning and transferring important franchisor rights and responsibilities under the Franchise Agreements to the distributor, including the right to control most, if not all, of the franchisees' business operations, including, without limitation, the price of gasoline and the payment terms.

42.     Plaintiffs have invested substantial time and money into growing their businesses through hard work, training, and the implementation of policies and procedures required and supported by ExxonMobil under the System to facilitate the growth and success of their businesses. . Plaintiffs have enjoyed business success under the symbiotic relationship with ExxonMobil, facilitated by the Divorcement Statute, which equalizes the bargaining power between ExxonMobil and Plaintiffs and causes ExxonMobil to be reliant upon Plaintiffs for success in the retail sale of gasoline in Maryland.

43.   . In stark contrast, Southside will not be reliant upon Plaintiffs for the sale of gasoline because as a distributor it is not subject to the Divorcement Statute and can directly operate gasoline stations and compete with Plaintiffs.   As a result, an assignment of the Franchise Agreements to Southside is nonsensical in that it places control over nearly every critical aspect of their businesses in the hands of Plaintiffs' direct competitor.   Such an assignment is a material change that poses a grave threat to Plaintiffs' businesses because it purports to transfer the extensive discretion and control over Plaintiffs' businesses from a refiner that cannot compete as a result of the Divorcement Statute to a non-refiner that can, and will, directly compete.   Placing such direct control over critical aspects of Plaintiffs' businesses,

including gasoline pricing and payment terms, is untenable and clearly represents an undue burden.

**Southside's New Pricing Procedures and Payment Requirements Following the Assignment Will Result In Undue Burden and Loss of Substantial Benefits to Plaintiffs.**

44.     Following ExxonMobil's announcement of its intent to sell the stations and assign the Franchise Agreements to Southside, a series of meetings was held to inform dealers about the Southside transaction.   During one of these meetings, Steve Uphoff, the owner of Southside, indicated that following the acquisition of the Maryland stations, Southside intends to compete directly in the Maryland retail market through a combination of commissioned agents, company stores, and dealers.  Notwithstanding such announcements, Southside indicated an interest and willingness to negotiate with the dealers, including Plaintiffs, regarding selling them the Premises on which their stations are located and entering into new distribution agreements.

45.     Plaintiffs were recently notified that the transfer of their stations to Southside was scheduled to occur on or about June 16, 2010, and that new payment procedures would be implemented. *See* Exhibit 2 attached hereto and incorporated herein by reference.

46.     On June 10, 2010, Southside held a meeting with all the dealers, including Plaintiffs, to go over its new procedures, requirements, and pricing policies that will go into effect immediately following the Assignment. The new procedures, requirements, and pricing policies substantially differ from ExxonMobil's System and not only eliminate substantial benefits but also will have a devastating effect on Plaintiffs' businesses.

47.     Specifically, Southside informed Plaintiffs that following the assignment it would discontinue several policies and procedures implemented by ExxonMobil in the performance of the Franchise Agreements including, without limitation, a change in the pricing structure imposed on Plaintiffs, a change in the terms of payment for the delivery of gasoline, a change in

the amount of the required security deposit and the manner of keeping the security deposit, and other changes all of which will materially increase Plaintiffs' burdens under the Franchise Agreements.

48.   Southside claims that ExxonMobil refuses to disclose the location of their existing zones used to establish Plaintiffs' DTW price for gasoline, and as a result, Southside is hiring a third-party to redraw the zones.

49.   Southside made it very clear, however, that it has no intention of continuing with ExxonMobil's zone pricing structure.  Southside did not disclose its exact pricing model but made it clear that, unlike ExxonMobil, Southside has substantial debt including loans from twelve banks and that in order to service its debt and earn a profit, it would not be able to sell below ExxonMobil's wholesale Rack Price.

50.   Southside essentially announced that rather than setting Plaintiffs' DTW price based on zone pricing of posted competitors' retail price of gasoline less a margin of eight to ten cents, Southside intends to implement a cost-plus pricing model, meaning Plaintiffs' DTW price will be calculated by Southside using ExxonMobil's wholesale Rack Price plus the addition of an undisclosed margin to cover Southside's debt service, expenses, and desired profit margin. Plaintiffs' DTW price using Southside's cost plus pricing will be higher than ExxonMobil's DTW based on zone pricing and will result in a substantial loss to Plaintiffs.

51.   Plaintiffs' DTW price using ExxonMobil's zone pricing model virtually guarantees Plaintiffs that they will remain competitive, retain their customer sales, and continue with higher volumes, all of which has a positive impact on Plaintiffs' businesses.

52.   Southside has no such policy and appears to be focusing solely on its own costs and profit margins without regard for the impact on Plaintiffs' businesses because, Southside has

no need for Plaintiffs to succeed and grow their businesses.  To the contrary, Southside will benefit to the extent that Plaintiffs are unable to remain competitive and they lose their business, allowing Southside to step in after Plaintiffs' businesses have failed without ever having to pay Plaintiffs for their hard earned businesses.

53.   Obviously, Southside's refusal to continue with ExxonMobil's zone pricing model—which ensures that Plaintiffs remain competitive in their area and continue to grow their sales volumes—materially increases the burden and risk imposed on Plaintiffs.

54.   In addition to the loss of competitive pricing as a result of Southside's refusal (or inability) to continue with ExxonMobil's zone pricing, Southside has also announced new mandatory security deposit amounts and material changes as to when Plaintiffs are required to pay for fuel delivery.

55.   In a June 4, 2010 letter, Southside informed Plaintiffs of the increased motor fuel security deposit and the material change in the requirements for gasoline payments.  *See* Exhibit 2 attached hereto and incorporated herein by reference.  Southside is demanding a security deposit of either $25,000 or $50,000 per station depending on which "payment option" the dealer selects for payment of their gasoline.

56.   Southside will give Plaintiffs two options for paying for gasoline deliveries, which cost approximately twenty-five thousand dollars per load: the "Next Day Payment Option" or the "Second Day Payment Option."  Under the Next Day Payment Option, Plaintiffs will be required to pay Southside a $25,000 motor fuel security deposit, and they must authorize Southside to debit their company bank account for the cost of the gasoline delivered on the next business day after the gasoline is delivered.

57.     Under the Second Day Payment Option, Plaintiffs will be required to pay Southside a $50,000 motor fuel security deposit and must allow Southside to debit their bank account for the cost of the gasoline on the second business day after the gasoline is delivered.

58.     These onerous payment terms are made worse by the additional delay being imposed on Plaintiffs' receipt of their credit and debit card receivables as a result of Southside's unilateral decision to use dealers' credit and debit card funds to pay their own debts to ExxonMobil.

59.     Plaintiffs' debit and credit card receivables from retail sales will continue to be deposited into ExxonMobil's bank account only now ExxonMobil will deduct **Southside's** outstanding gasoline invoices from **Plaintiffs'** debit and credit card funds before depositing the balance of the funds into Southside's bank account the next business day.

60.     As if the use of Plaintiffs' debit and credit card funds as an interest-free unsecured line of credit is not enough, Southside has also stated that for those dealers choosing the Next Day Option, their credit card funds will be deposited into their company account on the next business day after Southside receives the funds and for those dealers choosing the Second Day Option, to the extent that Plaintiffs' credit card funds are available in Southside's account, Southside will deduct the outstanding gasoline invoice balance from those funds and then deposit the remaining funds in Plaintiffs' company account on the second business day after Southside receives the funds from ExxonMobil.

61.     Consequently, for those dealers choosing the Next Day Option, they are required to pay a twenty-five thousand dollar security deposit; to pay for their gasoline deliveries the next business day from their own funds; to allow a two-to-three day delay before receiving their own funds from debit and credit card sales of gasoline while Southside uses those funds to satisfy its

own gasoline invoices owed to ExxonMobil.  The only difference for those dealers choosing the Second Day Option is that they must pay a fifty thousand dollar security deposit, they get two days following receipt of gasoline to pay for it and they must wait an additional day while Southside uses its debit and credit card funds to pay its debts to ExxonMobil.

62.     Southside's new policies and requirements are going to require Plaintiffs to come up with a substantial amount of cash to sustain their businesses because not only will Southside require a significant security deposit, they will simultaneously make Plaintiffs' funds from credit and debit card sales, which comprise anywhere from approximately seventy to ninety percent of Plaintiffs' total gasoline sales, unavailable for three to four days while at the same time requiring that Plaintiffs pay for gasoline deliveries within one to two days.  In contrast, ExxonMobil requires a security deposit between nothing and twenty-five thousand dollars, it makes credit and debit card funds available the next business day, and it makes invoices payable in four to five days and allows Plaintiffs to use their debit and credit card funds to pay the gasoline invoices when due.

63.     Southside's detrimental changes will be implemented because Southside either elected not to, or was financially unable to, provide ExxonMobil with an adequate security deposit, which, upon information and belief, would have allowed Southside ten days to pay its outstanding invoices to ExxonMobil.

64.     Either Southside lacks the funds to provide for a sufficient security deposit to ExxonMobil, in which case the assignment certainly raises issues regarding Southside's ability to sustain its obligations under the Franchise Agreement, or Southside intends to utilize its unfettered control to destroy Plaintiffs' businesses.

65.     These detrimental changes demonstrate the value and importance to Plaintiffs of the protection they were afforded by entering into the Franchise Agreement, with a refiner that is subject to the Divorcement Statute.

66.     The one-sided, onerous new policies and procedures announced by Southside are indicative of a distributor/jobber franchisor that can compete with the dealers and has no motivations to promote Plaintiffs' success.  If the assignment to Southside is not stopped, Plaintiffs will lose the protection of the Divorcement Statute and the favorable zone pricing System implemented by ExxonMobil, and will face one-sided, unconscionable changes in the terms of payment for gasoline and security deposit requirements.

67.     As a direct and proximate result of these lost benefits and additional burdens, Plaintiffs will be unable to compete in the marketplace, and once Southside begins fulfilling its goal of operating one-third of the stations, Plaintiffs will be forced to close their businesses.

68.     In addition to the loss of material benefits and the imposition of new burdens, Southside has entered into contracts with a group of ExxonMobil dealers that will further injure Plaintiffs because those ExxonMobil dealers will be purchasing gasoline from Southside at a lower price than Plaintiffs even though they are within Plaintiffs geographic region.

69.     A group of dealers with direct-served gasoline services stations in Maryland (the **"Litigating dealers"**) filed suit against ExxonMobil in federal court asserting various claims relating to, among other things, ExxonMobil's planned sale and assignment to Southside. Southside entered into negotiations with the Litigating Dealers and, upon information and belief, entered into a settlement agreement.  Upon information and belief, the settlement agreement required that Southside offer the Litigating Dealers the opportunity to buy the Premises at an independently determined value and that Southside enter into a motor fuel distribution agreement

whereby the Litigating Dealers' cost of fuel was based on ExxonMobil's wholesale Rack Price as posted on OPIS plus the addition of a fixed agreed upon margin ("Rack Plus Pricing"). Upon information and belief, many of the Litigating Dealers accepted these offers and following the assignment by ExxonMobil to Southside, it will assign the Premises to those Litigating Dealers and begin implementing the Rack Plus Pricing provided in the new motor fuel distribution agreement.

70.    Concerned that the addition of increased competition by Exxon-branded dealers will be the final blow to their businesses, Plaintiffs tried in good faith to obtain similar deals from Southside including (1) either a long-term lease or to purchase their station Premises at an agreed upon value; and (2) new motor fuel supply contracts where the price of gasoline charged to Plaintiffs is Rack Plus Pricing, meaning ExxonMobil's wholesale Rack Price plus a fixed negotiated margin. Despite Plaintiffs' best efforts, Southside made no offers to some of the Plaintiffs and refused to offer motor fuel supply agreements based on Rack Plus Pricing.

71.    Although the ability to effectively compete with Rack Plus Pricing is not as certain as it is with ExxonMobil's zone pricing, the Litigating Dealers will have uncertainty as to how their price for gasoline is being determined, and because Southside is going to be implementing a cost plus pricing (based on ExxonMobil's wholesale Rack Price plus an unknown margin that factors in Southside's debt service, costs and desired profits), the Litigating Dealers will be paying less than Plaintiffs and the other dealers that have DTW pricing.

72.    If this assignment occurs, Southside will be in a position to engage in predatory business practices and put Plaintiffs out of business because it will both directly compete with Plaintiffs and have the power to control almost every aspect of Plaintiffs' businesses, including, most importantly, the price Plaintiffs will pay for gasoline and the terms of such payment. Given

Southside's stated policies and procedures that will impair Plaintiffs' cash flow and greatly inhibit their ability to grow their businesses, Plaintiffs will be unable to sustain their businesses.

73.     Thus, if the assignment from ExxonMobil to Southside is consummated, Plaintiffs will be irreparably harmed because they will lose their business and livelihood.

## COUNT I
### (Anticipatory Breach of Contract)
### Plaintiffs v. ExxonMobil

74.     Plaintiffs hereby reallege and incorporate by reference Paragraph Nos. 1 through 73 above.

75.     Each Plaintiff is a party to a Franchise Agreement.

76.     As described above, ExxonMobil notified Plaintiffs of its contract to assign its rights under the Franchise Agreements to Southside, a distributor that is not subject to the Divorcement Statute.   ExxonMobil's actions constitute a definite, positive, and unconditional refusal to perform under the Franchise Agreements.

77.     As described above, ExxonMobil's assignment of Plaintiffs' Franchise Agreements to Southside will breach the Franchise Agreements (and violate Md. Code, Commercial Law §2-210) because the assignment materially increases the burden or risk imposed on Plaintiffs under the Franchise Agreements because, among other things: (i) ExxonMobil's obligations under the Franchise Agreements cannot be performed by a distributor not subject to the Divorcement Statute; (ii) Southside's policy for the payment of gasoline deliveries differs substantially from ExxonMobil's payment policy; (iii) Southside's pricing structure for the sale of gasoline to Plaintiffs is less favorable compared to other dealers whose stations will also be assigned to Southside; and (iv) Southside will directly compete in the marketplace with Plaintiffs.

78.   As a result of ExxonMobil's breach of the Franchise Agreements, Plaintiffs will suffer immediate and irreparable damages.

WHEREFORE, Plaintiffs demand the following relief: (1) the issuance of a temporary restraining order and preliminary and permanent injunctions enjoining any conveyance of the real property on which Plaintiffs' stations are located and the assignment of any of the Franchise Agreements to Southside or any other distributor that is not subject to the Divorcement Statute; (2) a judgment declaring that ExxonMobil's sale of the station properties and intended assignment/transfer to Southside constitutes a breach of the Franchise Agreements and a violation of Maryland law; (3) reasonable attorney's fees and costs; and (4) such other and further relief as this Court may deem just and proper.

## COUNT II
### (Tortious Interference with Contractual and Economic Relations)
### Plaintiffs v. Southside

79.   Plaintiffs reallege and incorporate by reference each of the allegations set forth in Paragraphs No. 1 through 78 above.

80.   The Franchise Agreements are valid and enforceable contracts.

81.   Southside had knowledge of the existence of the Franchise Agreements and, thus, knew of the contractual and economic relationship between Plaintiffs and ExxonMobil.

82.   Southside knowingly, intentionally, and improperly is inducing ExxonMobil to breach the Franchise Agreements by offering to purchase ExxonMobil's rights under the Franchise Agreements and thereby gain control over the business operations of its direct competitors, including Plaintiffs.

83.   As discussed above, ExxonMobil subsequently agreed to transfer its rights, thereby anticipatorily breaching the Franchise Agreements.

84.   As a direct and proximate result of Southsides's interference and ExxonMobil's breaches, Plaintiffs will suffer substantial and irreparable economic damages.

WHEREFORE, Plaintiffs demand the following relief: (1) the issuance of a temporary restraining order and preliminary and permanent injunctions enjoining any conveyance of the real property on which Plaintiffs' stations are located and the assignment of any of the Franchise Agreements to Southside or any other distributor that is not subject to the Divorcement Statute; (2) a judgment declaring that ExxonMobil's sale of the station properties and intended assignment/transfer to Southside constitutes a breach of the Franchise Agreements and a violation of Maryland law; (3) reasonable attorney's fees and costs; and (4) such other and further relief as this Court may deem just and proper.

## COUNT III
### (Declaratory Judgment)
### Plaintiffs v. ExxonMobil and Southside

85.   Plaintiffs reallege and incorporate by reference each of the allegations set forth in Paragraphs No. 1 through 84 above.

86.   Plaintiffs bring this action pursuant to Section 3-406 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland for the purpose of determining a question of actual controversy between the parties.

87.   Plaintiffs have repeatedly objected to the assignment of the Franchise Agreements by ExxonMobil to Southside or any other distributor not subject to the Divorcement Statute.

88.   In response to Plaintiffs' objections, ExxonMobil and Southside have unequivocally indicated that they plan to move forward with the transaction.

89.   Determination of the dispute between the parties, and the issuance of a declaratory judgment, would serve to eliminate the uncertainty among the parties.

293330.3

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief: (1) a declaration that ExxonMobil's assignment of the Franchise Agreements to Southside (or any other distributor not subject to the Divorcement Statute) would violate Maryland commercial law, including Md. Code, Commercial Law §2-210, and the terms of the Franchise Agreements; (2) reasonable attorney's fees and costs; and (3) such other and further relief as this Court may deem just and proper.

### COUNT IV
### (Temporary, Preliminary, and Permanent Injunctive Relief)
### Plaintiffs v. ExxonMobil and Southside

90.     Plaintiffs reallege and incorporate by reference each of the allegations set forth in Paragraphs No. 1 through 89 above.

91.     Plaintiffs will suffer immediate, substantial, and irreparable injury before an adversary hearing can be had if ExxonMobil is not restrained from assigning its rights under the Franchise Agreements to Southside.

92.     Plaintiffs are likely to succeed on the merits of their claim, as is more particularly shown in the Memorandum in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction.

93.     The benefits to Plaintiffs in obtaining injunctive relief outweigh the potential harm to ExxonMobil if this Court grants the requested injunctive relief.

94.     The public interest is best served by granting the injunction.

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief: (1) the issuance of a temporary restraining order and preliminary and permanent injunctions enjoining any conveyance of the real property on which Plaintiffs' stations are located and the assignment of any of the Franchise Agreements to Southside or any other

distributor that is not subject to the Divorcement Statute; (2) reasonable attorney's fees and costs; and (3) such other and further relief as this Court may deem appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues triable by jury.

Respectfully submitted,

THOMAS M. WOOD, IV
NICHOLE M. GALVIN
Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.
One South Street
27th Floor
Baltimore, MD 21202
410-332-8523

Attorneys for Plaintiffs

293330.3                                    27

Respectfully submitted,

_____
THOMAS M. WOOD, IV
NICHOLE M. GALVIN
Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.
One South Street
27th Floor
Baltimore, MD 21202
410-332-8584

Attorneys for Plaintiffs

## VERIFICATION

I solemnly affirm, under penalties of perjury, that the contents of the foregoing

Complaint are true to the best of my knowledge, information and belief.

Date: 6/13/10          _____
                       PWZ, Inc.
                       By: Amran Pasha
                       Title: President

Date: 6/13/10          _____
                       Hana Corp.
                       By: Amran Pasha
                       Title: President

Date: _____  _____
                       Fenton Street Service Station, Inc.
                       By: Altaf Lakhani
                       Title: _____

293330                              28

<u>VERIFICATION</u>

I solemnly affirm, under penalties of perjury, that the contents of the foregoing

Complaint are true to the best of my knowledge, information and belief.

Date:_____

_____
PWZ, Inc.
By: Amran Pasha
Title: President


Date:_____

_____
Hana Corp.
By: Amran Pasha
Title: President


Date: _6/14/10_____

_____
Fenton Street Service Station, Inc.
By: Altaf Lakhani
Title: _/President/_____

293330                                    28

Date: 6/14/10 _____

_____
Redland Service Station, Inc.
By: Altaf Lakhani
Title: _____

Date: 6/4/10 _____

_____
AMAFHH Oasis, Inc.
By: Altaf Lakhani
Title: _____

Date: _____

_____
Fuel Management, Inc.
By: Shahid Mahmood
Title: _____

Date: _____

_____
Energy Management, Inc.
By: Shahid Mahmood
Title: _____

Date: _____

_____
Gtown, Inc.
By: Mrugresh Majmudar
Title: _____

Date: _____

_____
Mili Enterprises, Inc.
By: Mrugresh Majmudar
Title: _____

Date: _____

_____
Best Effort First Time, LLC
By: Ryan Daggle
Title: _____

Date: _____

Redland Service Station, Inc.
By: Altaf Lakhani
Title: _____


Date: _____

AMAFHH Oasis, Inc.
By: Altaf Lakhani
Title: _____


Date: 6/14/10

Fuel Management, Inc.
By: Shahid Mahmood
Title: President / Owner


Date: 6/14/10

Energy Management, Inc.
By: Shahid Mahmood
Title: Owner / President


Date: _____

Gtown, Inc.
By: Mrugresh Majmudar
Title: _____


Date: _____

Mili Enterprises, Inc.
By: Mrugresh Majmudar
Title: _____


Date: _____

Best Effort First Time, LLC
By: Ryan Daggle
Title: _____


293330

29

Date:_____        Redland Service Station, Inc.
                                      By: Altaf Lakhani
                                      Title:_____


Date:_____        AMAFHH Oasis, Inc.
                                      By: Altaf Lakhani
                                      Title:_____


Date:_____        Fuel Management, Inc.
                                      By: Shahid Mahmood
                                      Title:_____


Date:_____        Energy Management, Inc.
                                      By: Shahid Mahmood
                                      Title:_____


Date: 6/14/2010                       Gtown, Inc.
                                      By: Mrugesh Majmudar
                                      Title: PRESIDENT


Date: 6/14/2010                       Mili Enterprises, Inc.
                                      By: Mrugesh Majmudar
                                      Title: PRESIDENT


Date:_____        Best Effort First Time, LLC
                                      By: Ryan Daggle
                                      Title:_____


293330                                29

Date: _6/13/10_

_____
East Gude
By: Sunil Kapoor
Title: _PRESIDENT_


Date: _____

_____
Hanover Service, Inc.
By: Sajid Chaudry
Title: _____


293330                          30

Date: _____          _____
                                 East Gude
                                 By: Sunil Kapoor
                                 Title: _____

Date: 6-13-10                    Sajid Chaudry
                                 Hanover Service, Inc.
                                 By: Sajid Chaudry
                                 Title: President

293330                    30

Circuit Court for _____ <u>BALTIMORE COUNTY</u> _____
City or County

## CIVIL - NON-DOMESTIC CASE INFORMATION REPORT

**DIRECTIONS:**
    *Plaintiff: This information Report must be completed and attached to the complaint filed with the Clerk of Court unless your case is exempted from the requirement by the Chief Judge of the Court of Appeals pursuant to Rule 2-111(a). A copy must be included for each defendant to be served.*
    *Defendant: You must file an Information Report as required by Rule 2-323(h).*
    ***THIS INFORMATION REPORT CANNOT BE ACCEPTED AS AN ANSWER OR RESPONSE***

FORM FILED BY: [X] PLAINTIFF [ ] DEFENDANT    CASE NUMBER _____
Clerk to insert

CASE NAME: <u>PWZ, INC., et al.</u> ____ vs. <u>ExxonMobil Oil Corporation, et al.</u>
        Plaintiff                                           Defendant

JURY DEMAND: [✓] Yes [ ] No   Anticipated length of trial: _____ hours or **2** days *weeks*
RELATED CASE PENDING? [ ] Yes [✓] No   If yes, Court and case #(s) if known: _____

Special Requirements? [ ] Interpreter/communication impairment   Which language_____
(Attach Form 1-332 if Accommodation or Interpreter Needed)     Which dialect_____
                [ ] ADA accommodation:_____

### NATURE OF ACTION
(CHECK ONE BOX)

### DAMAGES/RELIEF

| TORTS | LABOR | A. TORTS |
|---|---|---|
| [ ] Motor Tort | [ ] Workers' Comp. | **Actual Damages** |
| [ ] Premises Liability | [ ] Wrongful Discharge | [ ] Under $7,500   [ ] Medical Bills |
| [ ] Assault & Battery | [ ] EEO | [ ] $7,500 - $50,000   $_____ |
| [ ] Product Liability | [ ] Other _____ | [ ] $50,000 - $100,000   [ ] Property Damages |
| [ ] Professional Malpractice | **CONTRACTS** | [✓] Over $100,000   $_____ |
| [ ] Wrongful Death | [ ] Insurance |   [ ] Wage Loss |
| [✓] Business & Commercial | [ ] Confessed Judgment |   $_____ |
| [ ] Libel & Slander | [✓] Other _____ | |
| [ ] False Arrest/Imprisonment | **REAL PROPERTY** | **B. CONTRACTS**   **C. NONMONETARY** |
| [ ] Nuisance | [ ] Judicial Sale | [ ] Under $10,000   [✓] Declaratory Judgment |
| [ ] Toxic Torts | [ ] Condemnation | [ ] $10,000 - $20,000   [✓] Injunction |
| [ ] Fraud | [ ] Landlord Tenant | [✓] Over $20,0000   [ ] Other |
| [ ] Malicious Prosecution | [ ] Other _____ | |
| [ ] Lead Paint | **OTHER** | |
| [ ] Asbestos | [ ] Civil Rights | |
| [ ] Other | [ ] Environmental | |
| _____ | [ ] ADA | |
| | [ ] Other | |

### ALTERNATIVE DISPUTE RESOLUTION INFORMATION
Is this case appropriate for referral to an ADR process under Md. Rule 17-101? (Check all that apply)
    A. Mediation [✓] Yes [ ] No     C. Settlement Conference [✓] Yes [ ] No
    B. Arbitration [ ] Yes [✓] No     D. Neutral Evaluation [ ] Yes [✓] No

### TRACK REQUEST
*With the exception of Baltimore County and Baltimore City, please fill in the estimated LENGTH OF TRIAL. THIS CASE WILL THEN BE TRACKED ACCORDINGLY.*
    [ ] 1/2 day of trial or less     [ ] 3 days of trial time
    [ ] 1 day of trial time     [✓] More than 3 days of trial time
    [ ] 2 days of trial time

**PLEASE SEE PAGE TWO OF THIS FORM FOR INSTRUCTIONS PERTAINING TO THE BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM AND ADDITIONAL INSTRUCTIONS IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE COUNTY, BALTIMORE CITY, OR PRINCE GEORGE'S COUNTY.**

Date __06/14/10__        Signature _____

CC/DCM 002 (Rev. 11/2008)            Page 1 of 3

## BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM

*For all jurisdictions, if Business and Technology track designation under Md. Rule 16-205 is requested, attach a duplicate copy of complaint and check one of the tracks below.*

☐
**Expedited**
Trial within 7 months of
Defendant's response

☑
**Standard**
Trial - 18 months of
Defendant's response

☐ EMERGENCY RELIEF REQUESTED _____

| Signature | Date |
|---|---|

*IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE COUNTY, BALTIMORE CITY, OR PRINCE GEORGE'S COUNTY PLEASE FILL OUT THE APPROPRIATE BOX BELOW.*

### CIRCUIT COURT FOR BALTIMORE CITY (CHECK ONLY ONE)

☐ Expedited — Trial 60 to 120 days from notice. Non-jury matters.

☐ Standard-Short — Trial seven months from Defendant's response. Includes tort with actual damages up to $7,500; contract claims up to $20,000; condemnations; injunctions and declaratory judgments.

☐ Standard-Medium — Trial 12 months from Defendant's response. Includes torts with actual damages over $7,500 and under $50,000, and contract claims over $20,000.

☐ Standard-Complex — Trial 18 months from Defendant's response. Includes complex cases requiring prolonged discovery with actual damages in excess of $50,000.

☐ Lead Paint — Fill in: Birthdate of youngest plaintiff_____

☐ Asbestos — Events and deadlines set by individual judge.

☐ Protracted Cases — Complex cases designated by the Administrative Judge.

### CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY

To assist the Court in determining the appropriate Track for this case, check one of the boxes below. This information is <u>not</u> an admission and may not be used for any purpose other than Track Assignment.

☐ Liability is conceded.
☐ Liability is not conceded, but is not seriously in dispute.
☐ Liability is seriously in dispute.

### CIRCUIT COURT FOR BALTIMORE COUNTY

☐ Expedited
(Trial Date-90 days) — Attachment Before Judgment, Declaratory Judgment (Simple), Administrative Appeals, District Court Appeals and Jury Trial Prayers, Guardianship, Injunction, Mandamus.

☐ Standard
(Trial Date-240 days) — Condemnation, Confessed Judgments (Vacated), Contract, Employment Related Cases, Fraud and Misrepresentation, International Tort, Motor Tort, Other Personal Injury, Workers' Compensation Cases.

☐ Extended Standard
(Trial Date-345 days) — Asbestos, Lender Liability, Professional Malpractice, Serious Motor Tort or Personal Injury Cases (medical expenses and wage loss of $100,000, expert and out-of-state witnesses (parties), and trial of five or more days), State Insolvency.

☑ Complex
(Trial Date-450 days) — Class Actions, Designated Toxic Tort, Major Construction Contracts, Major Product Liabilities, Other Complex Cases.

CC/DCM 002 (Rev. 11/2008)          Page 2 of 3

| COMPLEX SCIENCE AND/OR MEDICAL CASE MANAGEMENT PROGRAM (ASTAR) |
|---|
| *FOR PURPOSES OF POSSIBLE SPECIAL ASSIGNMENT TO AN ASTAR RESOURCE JUDGE under Md. Rule 16-202. Please check the applicable box below and attach a duplicate copy of your complaint.* |
| ☐ Expedited - Trial within 7 months of Defendant's response          ☐ Standard - Trial within 18 months of Defendant's response |